IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 6, 2008

## STATE OF TENNESSEE v. GERALD SANFORD

**Appeal from the Shelby County Criminal Court
No. 04-05865     John P. Colton, Judge**

**No. W2007-00664-CCA-R3-CD  - Filed August 1, 2008**

The defendant, Gerald Sanford, appeals his Shelby County Criminal Court conviction on one count of first degree murder. In this appeal, he contends that there was insufficient evidence to convict him of the crime. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which DAVID H. WELLES, J. and DAVID G. HAYES, SR. J., joined.

Robert Wilson Jones, District Public Defender; and Harry Sayle and Time Albers, Assistant District Public Defenders (at trial); and Garland Ergüden, Assistant District Public Defender (on appeal), for the appellant, Gerald Sanford.

Robert E. Cooper, Jr., Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; William L. Gibbons, District Attorney General; and Michael Davis and Greg Gilbert, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

On August 24, 2004, a Shelby County grand jury indicted the defendant on one count of first degree murder. After a trial on December 4-9, 2006, a jury convicted the defendant of the charge and imposed a sentence of life imprisonment without parole.

At the trial, John Sutphin testified he was a security officer for Federal Express. On May 30, 2004, he was dispatched to an area off Business Park Drive. When he first arrived, he observed the defendant getting out of a Chevrolet Blazer with a flat front left tire. Officer Sutphin testified that the defendant was naked from the waist down, "had blood all over him," appeared scared and nervous, and asked the officer to "help his baby." After checking on the victim, Kelly Alexander, Officer Sutphin noticed that the victim was on the ground and holding a tire iron. Upon closer inspection he noticed that "[s]he was covered in blood. . . . I observed a severe gash over her

right eye. There was no movement of the chest as in breathing. Her eyes looked to be fixed, that of death." Officer Sutphin then immediately called for backup.

Officer Sutphin testified that the defendant told him that he was approached by two unidentified men right after he and the victim finished having oral sex. The defendant claimed the unknown men attacked him and the victim, but he could not provide a description of the attackers.

Several officers testified about what they discovered and did when they arrived on the scene. Soon after the police arrived, they handcuffed the defendant and placed him in a police patrol car when he became emotional and "out of control." The defendant complained of injuries to his right hand as well as his feet. He continued telling officers that he and the victim were attacked by two unidentified assailants. The defendant explained that the victim picked him up and drove them to this remote location because she had a restraining order filed against him and they were not supposed to be together.

An investigation of the crime scene revealed several trails of blood, shattered auto glass, and an open-toed sandal in the grass. One blood trail led to the broken glass, another led from the victim, and yet another led to a nearby dumpster. The officers found blood on and around the dumpster. Inside the dumpster, the officers found a right shoe, a "flip flop" or shower shoe, red shorts, and some plastic bags.

Donna Nelson, a forensic scientist assigned to the serology and deoxyribonucleic acid (DNA) unit of the Tennessee Bureau of Investigation (TBI), testified that she examined vaginal, rectal, and oral swabs from the victim to look for the presence of sexual activity. The vaginal swab revealed the presence of semen, but she found no DNA profile other than that of the victim. The rectal and oral swabs tested negative for semen.

Ms. Nelson next examined a blood standard from the victim, as well as samples from the victim's right-hand fingernails. The fingernail scrapings indicated the presence of blood and human DNA, with the major contributor matching the victim and the minor contributor of the profile matching the defendant. Swabs from the front grill of the vehicle, the outside windshield, and the hood of the driver's side door indicated blood from the victim. A swab from the inside rearview mirror was a partial match with the defendant. Swabs from blood found on the steering wheel, the top of the left seat, driver's door arm rest, right rear seat, outside of the rear right door, left rear seat, and left rear door matched the defendant. Blood found on the left shower shoe indicated the presence of a mixture of blood DNA, with the defendant being the major contributor and the victim being the minor contributor. Blood found on the tire iron indicated the presence of a mixture of blood DNA, with the victim being the major contributor and no determination possible for the minor contributor. Blood DNA found on the pair of shoes, the victim's cell phone, and the victim's car keys matched that of the defendant. Blood DNA found on a tissue and the victim's purse matched that of the victim. Fifteen swabs were taken from the parking lot and dumpster area, with eight of them indicating a complete match to the defendant's DNA, six of them containing partial DNA profiles matching the defendant's profile, and the final swab containing a mix of DNA where the defendant was the major contributor and no determination could be made for the minor profile.

-2-

The defendant was later formally questioned by the homicide bureau of the Memphis Police Department. At this point in the investigation he waived his rights and gave a statement that contrasted with what he had told officers at the crime scene. The defendant admitted responsibility for the victim's death, telling officers, "I hit her." His statement described the events of the evening as follows:

> She came to my house about two thirty a.m. this morning and picked me up and said she wanted to go somewhere and talk. . . . We went behind FedEx and she told me that she was aware of all the women I was sleeping with and she was tired of it. She told me she was pregnant and that she wanted a relationship with me. She wanted to marry me and raise our two kids together. I told her that was not what I really wanted. That made her angry. She said she had devoted five years to this relationship and we were going to be together. I told her, no, we were not. We had words and she pulled [a] knife out on me and said if she couldn't have me, no one could. I panicked and hit her. After I hit her, she swung the knife at me and stabbed me. That's what cut my right hand. I got stitches. I hit her again. This time I hit her too hard and I really hurt her. I panicked again and hurt her. She tried to drive off after I realized I had hit her a second time and really hurt her. I jumped back in the car. That's how my legs and stuff got scarred up. She was going fast and lost control of the car and hit the curb and wrecked. It messed her face up. I got out and pulled her out of the truck to see if she was okay. She told me she was dying and I panicked. I hit her with the stick that she had in the car. My shorts came off me because they were real loose when I was trying to get back in the car and she drove off. I was going to walk off and leave the scene but my heart wouldn't let me. I walked back to her truck and called 9-1-1 and that was it.

The defendant admitted to the police that his original story to the police about being the victim of an attack was a lie that he made up because he was scared. No knife was ever recovered at the scene of the crime.

Thomas Deering, interim chief medical examiner for Shelby County, testified that he performed the autopsy on the victim. He stated that the victim had multiple lacerations from blunt trauma injuries, which are "blows either of such force that the skin is tearing or the blows are – the force is being focused on a fairly narrow surface so that as it hits the skin, it's tearing the skin." The lacerations were consistent with being hit with a tire iron. Mr. Deering determined that the victim received 20 separate blows to the head excluding the mouth, all of which were suffered while the victim was still alive. The victim's cheekbone and nose were broken, she was missing a tooth, and she had a black eye. The victim had lacerations and abrasions on her neck consistent with a tire iron. Mr. Deering testified that in his opinion, the cause of death was due to multiple blunt trauma injuries inflicted to the head and the neck.

The defendant chose not to testify.

The defendant's sole argument on appeal is that the evidence was insufficient to convict him of first degree murder. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). The rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *Winters*, 137 S.W.3d at 654.

In determining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

Tennessee Code Annotated section 39-13-202(a)(1) provides that "[f]irst degree murder is . . . [a] premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2006). "'[P]remeditation' is an act done after the exercise of reflection and judgment." *Id*. § 39-13-202(d).

Proof of premeditation is inherently circumstantial. The trier of fact cannot speculate what was in the killer's mind, so the existence of premeditation must be determined from the defendant's conduct in light of the circumstances surrounding the crime. *See State v. Johnny Wright*, No. 01C01-9503-CC-00093 (Tenn. Crim. App., Nashville, Jan. 5, 1996) (citing LaFave and Scott, *Substantive Criminal Law* §7.7 (2nd ed. 1986)). Thus, in evaluating the sufficiency of proof of premeditation, the appellate court may look to the circumstances surrounding the killing. *See, e.g., State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Coulter*, 67 S.W.3d 3, 72 (Tenn. Crim. App. 2001). Such circumstances may include "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660. Although the infliction of multiple blows to the victim is not alone sufficient to establish premeditation, *see State v. Brown*, 836 S.W.2d 530, 541-43 (Tenn. 1992), repeated blows that evidence the particularly brutal nature of the killing are supportive of a jury's finding of premeditation, *see State v. Sims*, 45 S.W.3d 1, 8 (Tenn. 2001).

Despite the defendant's claim that the victim brandished a knife, no weapon was ever found, leading to the inference that the victim was unarmed. The victim and the defendant had been previously involved in a romantic relationship and were fighting on the evening of the altercation. The defendant repeatedly lied to the police after the murder by claiming that he and the victim had been attacked. The victim suffered multiple blows to the head and neck while still alive, breaking several bones and causing numerous lacerations. The brutality of this attack is heightened by the

-4-

fact that the attack on the victim had several stoppages, followed by continued beatings by the defendant. The victim attempted to escape from the defendant before he "jumped back in the car" to attack her again. When the victim then crashed her automobile, the defendant then "panicked" and "hit her with the stick," killing her. Applying the inferences from the evidence in a light most favorable to the State, we conclude that the evidence in the record formed a reasonable basis for the jury to conclude that the defendant acted with premeditation in killing the victim.

Accordingly, we affirm the judgment of the trial court.

_____

JAMES CURWOOD WITT, JR., JUDGE